## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GERALD BENNETT | : | CIVIL ACTION |
| | : | |
| v. | : | NO.  07-3935 |
| | : | |
| LOUIS S. FOLINO, et al. | : | |

### MEMORANDUM

LOWELL A. REED, Jr., Sr. J                                             April 7, 2008

   Presently before this court is the *pro se* Petition for Writ of Habeas Corpus filed

by petitioner Gerald Bennett ("Bennett") and the response of the defendants thereto (Doc. Nos. 1

& 13).  For the reasons set forth below, Bennett's petition will be dismissed.

## I.  PROCEDURAL AND FACTUAL HISTORY

   On July 20, 2000, in the Court of Common Pleas of Delaware County,

Pennsylvania, a jury found Bennett guilty of Third Degree Murder and two counts of Rape.  On

July 16, 2001, Bennett was sentenced to a term of 240 to 480 months for the Third Degree

Murder conviction, a consecutive term of 120 months to 240 months on the first count of Rape,

and a consecutive term of 120 months to 240 months on the second count of Rape, for a total

term of incarceration of 40 to 80 years.  At trial, Bennett was represented by Scott Galloway,

Esquire ("Galloway").

   Steven C. Leach, Esquire ("Leach"), was appointed as Bennett's counsel during

the post-sentence motions and during his direct appeal to the Superior Court.  Bennett and Leach

filed two post-sentencing motions which were denied on November 16, 2001.  On appeal, the

Superior Court upheld the judgment of sentence on April 28, 2003.  The Pennsylvania Supreme

Court denied the petition for allowance of appeal on November 12, 2003.

On January 12, 2004, Bennett filed a *pro se* Post-Conviction Collateral Relief Act ("PCRA") petition.  Henry D. Forrest, Esquire ("Forrest") was appointed as counsel and filed an amended petition.  On February 22, 2005, the court dismissed the petition.  Bennett proceeded *pro se* with his appeal of the denial of the PCRA petition.  The Superior Court affirmed the denial of the PCRA relief on April 18, 2006 and the Pennsylvania Supreme Court denied the petition for allowance of appeal on August 29, 2007.  On September 20, 2007, Bennett filed the instant Petition for Writ of Habeas Corpus.

The incidents resulting in Bennett's arrest occurred between the evening of August 31, 1999 and the morning of September 1, 1999, at which time Bennett was living in a small second floor apartment with R.L. and her thirteen-year-old daughter, A.L.  The majority of the salient facts come from the incontroverted testimony of A.L.  A.L. last saw her mother alive at approximately 3 a.m. talking with Bennett in the apartment.  (N.T. 7/18/00, pp. 63, 67-68).  Sometime shortly before 6:30 a.m., A.L. awoke in her bedroom on her stomach with Bennett lying on top of her.  Bennett then produced a knife and forced A.L. to go into his bedroom.  (N.T. 7/18/00, pp. 72-77).  While in his bedroom, Bennett told A.L. that her mother was tied up and dead.  (N.T. 7/18/00, pp. 77-78).  Bennett then ordered A.L. to remove her clothes, and at knife-point, he raped her.  (N.T. 7/18/00, pp. 79-82).  Not long after, Bennett then stated "I might as well do it to you again because you're going to put me in jail" and he proceeded to rape her for a second time.  (N.T. 7/18/00, pp. 106-07).

After the second assault, Bennett told A.L. that he was going to let her go.  A.L. then ran to her bedroom but Bennett followed her and put his foot in the door so she could not close it.  Bennett then entered the room and shut the door behind him.  (7/18/00, pp. 110-11, 114-

115).  Over this time period, Bennett told A.L. several more times that her mother was dead and

that he had killed her.  (7/18/00, pp. 109, 116-18).  A.L. reminded Bennett that he had promised

to let her go, to which Bennett, replied, "well I lied."  (N.T. 7/18/00, p. 116).  A.L. begged

Bennett to let her see her mother and he eventually acceded to her request.  (N.T. 7/18/00, pp.

118-19).  A.L. went over to the couch in the livingroom where her mother's body was laying and

removed a pillow from her face.  A.L. could see that R.L. was purple and that there was a long

purple line around her neck.  A.L. said, "I'm going to be sick" and ran out of the apartment.

(N.T. 7/18/00, pp. 120-21).

　　　　　A.L. started screaming "My mom's dead, my mom's dead!" and ran towards

Maguire's Bar out of which came Carol Ann Persia ("Persia").  (N.T. 7/18/00, pp. 121-123).

Persia was opening the bar at approximately 11:15 a.m. when she heard A.L. screaming and saw

A.L. running towards her.  (N.T. 7/18/00, pp. 219-223).  Persia called 911 while A.L. screamed

that "Gerry" had raped her and killer her mother.  (N.T. 7/18/00, pp. 224-25).  A.L. used Persia's

cell phone to call her uncle Chris and aunt, Donna Miller ("Miller").  (N.T. 7/18/00, p. 226).

When the police arrived, A.L. told them that she had been raped and her mother had been killed

in the apartment.  (N.T. 7/18/00, p. 237).  A.L. was then taken to the hospital by ambulance.

(N.T. 7/18/00, p. 125).  In the apartment, the police found a deceased woman laying on the couch

and Bennett was not in the apartment.  (N.T. 7/18/00, pp. 239, 245-46).

　　　　　At the crime scene, the medical examiner observed, *inter alia*, that R.L. had

several fresh abrasions and scratches, that her face was swollen and purple and that there was a

ligature mark around her neck.  (N.T. 7/19/00, p. 44-50).  The medical examiner opined that the

cause of death was ligature strangulation and that the death was a homicide.  (N.T. 7/19/00, p.

66).

Dr. Donna Scott ("Dr. Scott") examined A.L. in the emergency room where A.L. told her that she had been held captive, threatened with a knife, and raped twice. (N.T. 7/19/00, pp. 85-90). Dr. Scott observed several fresh external bruises on A.L. and bruising of her hymen, all of which corroborated A.L.'s story. (N.T. 7/19/00, pp. 91-95). Dr. Scott opined that A.L. had been forcefully pushed down or up against a surface and had been subject to sexual intercourse that day. (N.T. 7/19/00, pp. 92, 95, 105). Dr. Henry Go ("Dr. Go"), a forensic scientist, later concluded that A.L.'s stretch pants, a pillowcase from Bennett's room, a white sheet, and genital swabbings from A.L. contained seminal material. (N.T. 7/19/00, pp. 140-50).

After A.L. escaped, at approximately 2 p.m., Bennett went to the VIP Family Restaurant where he worked and asked the manager for his pay. Although it was not payday, Bennett said that his father had died and that he needed the money to take a bus to North Carolina. Bennett was anxious, sweating, his eyes were bloodshot and he was in a hurry. The manager said that she had to check his hours to make sure he was given all of the money owed to him. However, Bennett told her not to check and to just give him pay for seven hours of work. The manager gave Bennett $44. Bennett stated that he probably would not be coming back. (N.T. 7/18/00, pp. 263-68). Bennett was apprehended later that day around 6 p.m. (N.T. 7/18/00, p. 255). A more comprehensive review of the facts may be found in the original state court opinion. Comm. v. Bennett, No. 99-3014 (Pa. Ct. of Com. Pleas, Del. Cty., July 16, 2002) ("Trial Court Opinion").

## II.     STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") increased the deference federal courts must give to the factual findings and legal determinations of the state courts.  Werts v. Vaughn, 228 F.3d 178, 196 (3d Cir. 2000).  Under 28 U.S.C. § 2254(d), as amended by the AEDPA, the court may grant a petition for habeas corpus only if:  (1) the state court's adjudication of the claim "resulted in a decision contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States;" or (2) the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  Factual issues determined by a state court are presumed to be correct and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence. Werts, 228 F.3d at 196 (citing 28 U.S.C. § 2254(e)(1)).

In Williams v. Taylor, the United States Supreme Court further interpreted and clarified the AEDPA standards.  529 U.S. 362 (2000).  The Court explained that under the "contrary to" clause, the federal court may grant the writ if the state court: (1) arrives at a conclusion opposite to that reached by the Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. Hameen v. State of Del., 212 F.3d 226, 235 (3d Cir. 2000) (citing Williams, 529 U.S. at 412-13). The Court in Williams also found that under the "unreasonable application" clause, the federal court may grant the writ if the state court: (1) identifies the correct legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case, or (2) either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new

5

context where it should apply.  Williams, 529 U.S. at 407; Hameen 212, F.3d at 235.  Ultimately, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.

## III.    DISCUSSION

### A.    THE STATE COURTS' DETERMINATION THAT TRIAL COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO SUFFICIENTLY CHALLENGE CERTAIN PHYSICAL EVIDENCE WAS REASONABLE AND NOT CONTRARY TO ESTABLISHED LAW.

Bennett contends that his trial counsel, Galloway, provided ineffective assistance by failing to elicit testimony regarding several pieces of physical evidence.  The specific standard for ineffective assistance of counsel claims under the AEDPA is set forth in the two prong test of Strickland v. Washington, 466 U.S. 668 (1984).  Under the first prong of Strickland, a petitioner must show that trial counsel's performance was deficient, meaning that counsel did not provide reasonably effective assistance as defined by prevailing professional norms.  Outten v. Kearney, 464 F.3d 401, 414 (3d Cir. 2006) (citing Strickland, 466 U.S. at 687-88).  Thus, the petitioner must establish that counsel's representation fell below an objective standard of reasonableness. Id.  Moreover, counsel's reasonableness must be assessed on the facts of the particular case, viewed as of the time of counsel's conduct.  Id. (citing Strickland, 466 U.S. at 689).  Under the second prong of Strickland, the petitioner must establish that the deficient performance prejudiced the defense.  Id. (citing Strickland, 466 U.S. at 687).  Thus, the petitioner must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Id. (citing Strickland, 446 U.S. at 694).  The petitioner must also establish that the claim has arguable legal merit.  Com. v. Natividad, 938

6

A.2d 310, 321 (Pa. 2007).

First, Bennett asserts that, in her testimony, A.L. claimed that she had been sleeping on a mattress in her room prior to Bennett's attack.  However, a crime scene photograph marked at trial as Commonwealth's exhibit C-19 shows what Bennett contends is a wooden table leg lying across the top of the mattress.[1]  Bennett claims that this somehow shows that A.L. could not have been sleeping on the mattress and, thus, Galloway should have asked A.L. on cross-examination about the location of this object and raised the impossibility of her having slept on the bed.  There is absolutely no evidence that the object pictured on the bed was in that exact position while A.L. slept.  It would have been bizarre and distracting for Galloway to have followed this line of questioning, thus, his actions were reasonable and did not prejudice Bennett.

Bennett also claims that Galloway should have cross-examined A.L. regarding whether she touched or handled anything after her finger was cut.  At trial, A.L. testified that when Bennett began assaulting her at knife point, he brought "the knife around and kind of got my finger."  (N.T. 7/18/00, p. 74).  Bennett contends that because A.L.'s blood was not apparent in the apartment, this line of questioning would have helped impeach her testimony.  This claim was properly rejected by the PCRA court in Commonwealth v. Bennett, No. 99-3014, at 13 (Pa. Ct. of Com. Pleas, Del. Cty., June 27, 2005) ("PCRA Opinion").  On cross-examination, Galloway asked A.L. whether her finger was bleeding.  She answered, "No, it was just like - it was barely.  Like not gushing blood, but . . . ."  Galloway then asked "It was bleeding some?" to which A.L. answered, "Yes."  (N.T. 7/18/00, pp. 190-91).  Later, Galloway elicited testimony

---

[1] The object on the mattress appears to be a white hollow plastic chair leg that has been wrapped in wood grain contact paper.  Also, in his brief, Bennett actually cites to the Commonwealth's exhibit C-18, but I believe this to be an error since no object is visible on the mattress in exhibit C-18.

through Dr. Scott and Dr. Go that no blood was found on A.L.'s clothing.  (N.T. 7/19/00, pp. 106-07, 154-55).  Finally, Galloway argued these facts in his closing.  (N.T. 7/20/00, p. 62).  As noted by the PCRA court, Galloway sufficiently and reasonably explored this topic and the evidence shows that A.L.'s finger was barely bleeding.  <u>PCRA Opinion</u>, at 13.  The PCRA court's conclusion was reasonable and not contrary to the law.  Further questioning regarding the lack of blood, which was explained by A.L.'s testimony, would not have changed the outcome of the case.

Next, Bennett asserts that Galloway failed to use A.L.'s underwear, which were free of semen and her stretch pants which allegedly contained only old semen to show that "A.L. was not raped at the times testified to by her but that she had engaged in prior consensual sex with this Petitioner." (Doc. No. 1, Brief, p. 6).  However, A.L. testified that after the second time she was raped, she did not put on her underwear and pants until sometime after running from Bennett's room into her room and attempting to block Bennett from entering her room.  (N.T. 7/18/00, pp. 110-11, 114-15, 120).  Moreover, semen was found in and around A.L.'s vagina.  (N.T. 7/19/00, p. 140; N.T. 7/20/00, p. 81).  Bennett's argument is meritless.  The fact that there did not happen to be any semen in A.L.'s underwear does not advance his theory that he neither raped A.L. nor killer her mother.  It was reasonable for Galloway not to make this argument and its absence did not prejudice Bennett.

Bennett further contends that there is a discrepancy in the time-line of events as described by A.L.  A.L. testified that Bennet began the assault around 6:30 a.m.  The evidence also shows that A.L. ran out of the apartment and encountered Persia at about 11:15 a.m.  However, A.L.'s description of events and their estimated timing do not add up to four hours and forty-five minutes.  Contrary to Bennett's argument, Galloway exploited this temporal

inconsistency during his cross-examination of A.L. and argued in his closing that A.L. was not believable as a result of the discrepancy.  (N.T. 7/18/00, pp. 198-202; N.T. 7/20/00, p. 63).  Therefore, Galloway's actions were reasonable and did not prejudice the petitioner.

In a related argument, Bennett notes that the testimony from Persia and A.L. establish that A.L. called someone on Persia's cell phone at about 11:15 a.m.  A.L. testified that she called Miller.  However, in her statement to the police, Miller claimed that A.L. called her at approximately 10:30 a.m. or 10:45 a.m.  (Doc. No. 13, Exh. A).  Bennett argues that A.L. must have made an earlier phone call to Miller from an undisclosed location and then used Persia's cell phone to call a different aunt.  Because A.L. allegedly did not disclose this other phone call, Bennett claims that her credibility is impeached and it shows that she must have lied regarding Bennett killing her mother and raping her twice.

Specifically, Bennett claims that Galloway improperly failed to cross-examine Persia regarding the call A.L. made on her cell phone, failed to subpoenaed Persia's cell phone records, and failed to call Miller as a witness to testify regarding the timing of A.L.'s call to her.  To prevail on a claim that trial counsel was ineffective for failing to present a witness, a petitioner must establish that: (1) the witness existed; (2) the witness was available; (3) counsel knew or should have known about the witness; (4) the witness was prepared to cooperate and testify at trial; and (5) the absence of the testimony prejudiced the petitioner.  Comm. v. Crawley, 663 A.2d 676, 679-80 (Pa. 1995).

Bennett hypothesizes, without any evidence, that Miller would have been able to prove with certainty that A.L. called her between 10:30 a.m. and 10:45 a.m.  However, in her statement, not only did Miller provide merely an approximate time frame, she also stated that A.L. said that she had called 911 and was in a bar with a woman.  (Doc. No. 13, Exh. A).  This

9

establishes that A.L. was already in the bar with Persia when she called Miller and completely eviscerates Bennett's contention that A.L. called Miller at an earlier time.  As a result, Galloway had a perfectly reasonable basis for not exploring this additional evidence and it is readily apparent that Galloway's actions did not prejudice Bennett.  The PCRA court properly rejected this claim concluding that Bennett had failed to show that Miller's testimony would have contradicted the testimony of Persia, had failed to prove that Miller was prepared to cooperate and testify at trial, and had failed to demonstrate prejudice.  PCRA Opinion, at 11-12.  The PCRA court's conclusion was reasonable and not contrary to the law.

Finally, Bennett contends that Galloway provided ineffective assistance by failing to have a towel which was found on R.L.'s body tested to see if it matched fibers from the ligature mark on her neck.  The towel also sported a lipstick imprint which, according to A.L.'s testimony could have been that of her lips or her mother's.  Bennett theorizes that because of these two facts, either A.L. or some other woman could have used the towel to strangle R.L.  Both the trial court and the Superior Court on direct appeal concluded that the claim was meritless and whether the towel was used to strangle R.L. or whether the lip imprint was A.L.'s would not have advanced Bennett's case.  Trial Court Opinion, at 42-44; Comm. v. Bennett, No. 3399 EDA 2001, at 11-12 (Super. Ct. of Pa., April 28, 2003) ("Appellate Opinion").  Galloway also explained that it was his opinion that testing the towel would not have added anything to his defense.  (N.T. 10/05/01, pp. 74-75).  As a result, I conclude that the state courts' determinations were reasonable and not contrary to established law.  Galloway's decision not to have the towel tested was reasonable and did not prejudice defendant.

**B.     THE STATE COURTS' DETERMINATION THAT TRIAL COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO PRESENT EVIDENCE REGARDING AN ALLEGED CONSENSUAL SEXUAL RELATIONSHIP BETWEEN BENNETT AND A.L. WAS REASONABLE AND NOT CONTRARY TO ESTABLISHED LAW.**

Bennett argues that Galloway failed to obtain testimony from Ernie Alexander ("Alexander") who, according to Bennett, would have testified that he was aware of a consensual sexual relationship between Bennett and A.L.  As discussed in the Trial Court Opinion and the Appellate Opinion, Galloway was not ineffective for failing to present Alexander as a witness.[2] Trial Court Opinion, at 39-41; Appellate Opinion, at 11.  Galloway explained that in a statement Alexander gave to the Public Defender's Office, Alexander indicated that he had witnessed "repeated instances of violence between Mr. Bennett and the deceased" including an incident where Bennett put R.L. up against the wall and choked her.  (N.T. 10/05/01, pp. 21, 68). Galloway was not sure whether the Commonwealth had a copy of Alexander's statement to the Public Defender's Office but he was aware that the Commonwealth did have a copy of another statement Alexander made to the Delaware County Criminal Investigation Division ("CID Statement").  Galloway was also aware that the Commonwealth had interviewed Alexander and was fearful that the Commonwealth knew the information contained in Alexander's statement to the Public Defender's Office.  (N.T. 10/05/01, p. 70); Trial Court Opinion, at 39-40.

In Alexander's CID Statement, which was introduced into evidence as Exhibit D-1 by Bennett at the October 5, 2001 post-sentence hearing, Alexander stated that, *inter alia*, while at R.L's apartment on August 31, 1999 (the night before the murder), he asked Bennett about a knife sticking in the wall and Bennett explained that he and R.L. had been arguing.

---

[2] Initially, Bennett claimed that Alexander's testimony was necessary to establish key time-lines.  It is only now that he claims that Alexander also had knowledge of a consensual sexual relationship between Bennett and A.L.

Alexander then stated to Bennett that "You better cut it out, cause you gone to either end-up,

somebody gone to get hurt or you're gone to jail."  (10/05/01 Hearing Exh. D-1, pp. 1-2).

Alexander also stated in his CID Statement that, on that same night, he had to throw Bennett out

of his friend Donna Jordan's house because he had "throw[n] her around a little bit, rough[ed]

her up a little bit."  (Id. at p. 4).  Galloway explained that as a result, Alexander "would have

been an extremely harmful witness to Mr. Bennett and I , along with consultation with Mr.

Bennett, ruled out, almost from the beginning, that he would not [sic] be a Defense witness."

(N.T. 10/05/01, pp. 21-22).  The decision by Galloway and Bennett not to call Alexander in light

of his knowledge of past violence between Bennett and R.L. was eminently reasonable.  As a

result, the state courts' conclusions to this effect were reasonable and not contrary to the law.[3]

### C.   THE PCRA COURT'S DETERMINATION THAT TRIAL COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO ATTEMPT TO ESTABLISH THE EXACT TIME OF R.L.'S DEATH WAS REASONABLE AND NOT CONTRARY TO ESTABLISHED LAW.

Bennett next claims that Galloway provided ineffective assistance by failing to

obtain expert testimony regarding the exact time of R.L.'s death.  Bennett believes that

pinpointing the exact time of death would have shown that the time-line A.L. testified to could

not have happened.  The PCRA court properly rejected this claim.  PCRA Opinion, at 12.  The

post mortem report of the medical examiner, which was introduced into evidence as Exhibit D-8

by Bennett at the October 5, 2001 post-sentence hearing, indicates that the exact time of R.L.'s

---

[3] Bennett claims that if Galloway had called Alexander as a witness, the Commonwealth would not have been able to ask Alexander about Bennett's violent behavior because his testimony would have been limited to the relationship between Bennett and A.L.  This is incorrect.  The Commonwealth would have had the opportunity to ask Alexander about his knowledge of Bennett's relationships with A.L. and R.L. as well as explore his bias and credibility.

death was unknown.  (10/05/01 Hearing Exh. D-8).  The PCRA court concluded that Bennett had

failed to produce any other evidence of the time of R.L.'s death and that this lack of additional

evidence did not prejudice Bennett.  PCRA Opinion, at 12.  The conclusion reached by the

PCRA court is reasonable and not contrary to the law.  The evidence shows that A.L. last saw her

mother alive around 3 a.m.  By approximately 6:30 a.m., Bennett told A.L. that he had killed her

mother.  Knowing the exact time of death of R.L. would not have exculpated Bennett.  Moreover,

Bennett has failed to establish the factors for showing ineffective assistance of counsel for failing

to call a witness as described in Crawley, 663 A.2d at 679-80, discussed more fully above in

Section III. A.

**D.    THE PCRA COURT'S DETERMINATIONS THAT TRIAL AND APPELLATE COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO RAISE CLAIMS REGARDING THE REPLAYING OF TESTIMONY AND THE EXPLANATION AS TO WHY AN EXPERT REPORT WAS NOT ADMITTED INTO EVIDENCE WERE REASONABLE AND NOT CONTRARY TO ESTABLISHED LAW.**

Bennett asserts that Galloway was ineffective for failing to challenge the trial

court's refusal to replay for the jury the testimony of Dr. Scott and A.L.[4]  This argument is

meritless since the trial court did not refuse to replay the testimony.  Bennett also alleges that

Galloway improperly failed to request a jury instruction regarding why Dr. Scott's rape

evaluation report was not placed into evidence.  This argument is also meritless.

During deliberations, the jury asked to re-hear the testimony of A.L. and Dr. Scott.

The trial judge properly explained that the only option available was for the jury to come back

into the court room and listen to the recorded testimony of these two witnesses in their entirety.

_____

[4] Bennett also claims that appellate counsel Leach similarly provided ineffective assistance by failing to raise Galloway's ineffectiveness regarding these issues.  Since trial counsel did not err, there is no viable claim that appellate counsel erred.  See e.g. Com. v. Williams, 936 A.2d 12, 28 (Pa. 2007).

The trial judge then asked the jury to inform him if they wished to do so.  (N.T. 7/20/00, pp. 146-48).  The jury next asked if they could see Dr. Scott's rape evaluation report rather than re-hear the testimony.  The trial judge explained that the report had not been entered into evidence and, thus, could not be shown to the jury.  (Id. at 150).  The jury, towards the end of the day, then asked to hear the testimony of Dr. Scott again and also asked to recess for the day.  The trial judge said that he could not honor that request at that time and, as a result, the jury should continue deliberations.  (Id. at 154-55).  The trial judge did state that he would re-visit the request to hear Dr. Scott's testimony in the morning.  (Id.).  However, after further deliberations, the jury then returned a verdict.  (Id. at 163-64).

These claims were properly rejected by the PCRA court and its conclusions were reasonable and not contrary to the law.  As noted by the PCRA court, whether to allow a jury to re-hear a witness' testimony is a matter within the discretion of the trial court.  Comm. v. Peterman, 244 A.2d 723, 726 (Pa. 1968).  Moreover, the PCRA correctly observed that requiring the entire transcript to be replayed rather than merely parts of it was not an abuse of discretion. Ultimately, the PCRA court held that because the jury reached a verdict that night rather than waiting until the next day to re-hear the testimony, there was no need for counsel to raise this meritless objection.  PCRA Opinion, at 14-15.

Similarly, the PCRA court rejected the argument that counsel was ineffective for failing to request an instruction to the jury as to the reasons why Dr. Scott's report was not introduced into evidence.  Dr. Scott testified regarding her rape examination findings and her conclusion that A.L. had been subject to sexual intercourse within the last twenty-four hours, and Galloway had the opportunity to cross-examined her.  (N.T. 7/19/00, pp. 84-114).  As noted by the PCRA court, it was unnecessary for Galloway to attempt to have the report entered into

14

evidence since all of the pertinent information was obtained through testimony.  The PCRA court found that Bennett's argument was speculative, conjectural and unsupported because there was simply no conceivable way that such an instruction to the jury would have advanced Bennett's case.  PCRA Opinion, at 15.  I agree and, as a result of the forgoing, I conclude that the findings of the PCRA court were reasonable and not contrary to the law.

### E.    COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO CROSS-EXAMINE DR. SCOTT REGARDING AN ALLEGED EARLIER SEXUAL ASSAULT OF A.L.

In her report, Dr. Scott states that A.L.'s aunt reported "that [A.L.] was sexually assaulted when she was 5 yrs old by mom's boyfriend in Florida.  Details of assault not known." (Doc. No. 1, Exh. 1, p. 4).  Bennett claims that Galloway erred by failing to use this information to cross-examine Dr. Scott regarding her rape examination conclusions.  Specifically, Bennett claims, without a shred of support, that it is likely that A.L.'s hymen would have broken during this earlier sexual assault, yet, Dr. Scott claimed in her testimony that A.L.'s hymen was intact but bruised by recent sexual intercourse.  This argument is completely speculative and meritless. The evidence shows that A.L.'s hymen was bruised as a result of recent sexual intercourse. There was simply no evidence to contradict the finding that A.L.'s hymen was intact.  Why trial counsel would cross-examine Dr. Scott regarding why A.L.'s hymen had not broken during a possible earlier sexual assault is truly a mystery.  There is absolutely no other evidence regarding this alleged earlier assault including whether there was penetration of the vagina.  It is chimerical that such a line of questioning would have remotely advanced Bennett's case in his favor. Galloway's actions regarding his cross-examination of Dr. Scott were reasonable and did not prejudice Bennett to the extent that, had such questions been asked, the outcome of the case would have been different.

**F.     THE PCRA COURT'S DETERMINATION THAT TRIAL COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO REQUEST CERTAIN POST-CONVICTION DNA TESTING WAS REASONABLE AND NOT CONTRARY TO ESTABLISHED LAW.**

Bennett contends that Galloway provided ineffective assistance by failing to have the blood stain on the sheet which was under R.L.'s body tested for DNA. Bennett speculates that such testing would have shown that the blood was not R.L.'s but A.L.'s and that the sheet came from A.L.'s room. Bennett somehow believes that such facts, if true, would establish that A.L. killed R.L. in A.L.'s room and that A.L. used the sheet to move R.L.'s body into the living room. As concluded by the PCRA court, even if testing showed that the blood was from A.L., the evidence would not have proven that Bennett could not have murdered R.L. A.L. lived in the small apartment with R.L. and could have transferred her blood onto the sheet at any time. Moreover, other than a small, nearly bloodless, cut on A.L.'s finger, there was no indication that A.L. was bleeding when she ran from the apartment. Thus, Bennett failed to show he was entitled to DNA testing since he failed to demonstrate that his identity was an issue in the case and exculpatory DNA test results would have established his actual innocence, as required by the PCRA. PCRA Opinion, at 16; 18; see 42 Pa. C.S.A. § 9543.1(c). The PCRA court's determination was reasonable and not contrary to the law.

**G.     THE PCRA COURT'S DETERMINATION THAT TRIAL AND APPELLATE COUNSEL WERE NOT INEFFECTIVE FOR ALLEGED FAILURES REGARDING A CAUTIONARY INSTRUCTION CONCERNING TESTIMONY ABOUT BENNETT'S FINGER PRINT IMPRESSIONS WAS REASONABLE AND NOT CONTRARY TO ESTABLISHED LAW.**

In his PCRA petition, Bennett claimed that Leach was ineffective for failing to argue during the appeal that Galloway was ineffective for failing to request a cautionary instruction regarding a statement made by Detective William Walsh ("Detective Walsh"), an

16

expert in fingerprint analysis.  During his testimony, Detective Walsh said that he was able to retrieve one latent fingerprint from the knife found at the apartment but that it was not Bennett's fingerprint.  (N.T. 7/20/00, p. 23).  On cross-examination, when asked how one would investigate such fingerprints, Detective Walsh stated that "What we do - in this case the defendant was one of the individuals that we knew was in the apartment and had access to the apartment.  So a search of the database was made that we have in the county and we obtained a set of ink impressions of the defendant."  (N.T. 7/20/00, p. 27).

Bennett claims that since Detective Walsh stated that a set of inked impressions of his fingerprints was in the county database, there was an implication to the jury that he had previously been arrested for or convicted of another crime.  Bennett asserts that "A passing reference to Detective Walsh's obtaining 'a set of ink impression of the defendant' from the county's data base would not by itself cause prejudice, however, in this case, it was the sole intent of the Commonwealth to prove prior criminal activity."  (Doc. No. 1, Brief, p. 33).

The PCRA court first concluded that Bennett had waived this issue by failing to raise it in his petition.   Next, the PCRA court reviewed the merits of the claim and found it to be completely frivolous.  PCRA Opinion, at 20.  I agree.  There is absolutely no evidence that the Commonwealth intended for this one comment to communicate to the jury that Bennett had a criminal history.  The prosecutor merely asked Detective Walsh:  (1) what a latent fingerprint was; (2) how one would develop a latent fingerprint as a part of an investigation; and (3) how one would use the developed latent fingerprint to conduct further investigation.  (N.T. 7/20/00, pp. 24-27).  There is simply no evidence of bad motive on the part of the Commonwealth, thus, we are left with merely "a passing reference" which Bennett admits is not enough to show prejudice.  The reference to the database was brief, not intentionally elicited and not exploited.

17

The jury knew that Bennett had been charged with the murder and rapes and would know that, as a result, his fingerprints would be available to the police. Moreover, the jury was not told how the county database was compiled. The conclusion of the PCRA court was reasonable and not contrary to the law. Had Galloway requested such a cautionary instruction it would have served merely to draw unwanted attention to the statement. Bennett has failed to establish that Galloway's failure to do so prejudiced him to such a degree that, had he requested the instruction, the outcome of his case would have been different.

### H.    THE STATE COURTS PROPERLY DETERMINED THAT BENNETT'S SENTENCE, WITHIN THE STATUTORY MAXIMUMS, WAS LEGAL AND NOT EXCESSIVE.

Bennett was sentenced to 240-480 months for Third Degree Murder and 120-240 months for each Rape. Bennett claims that because the Rape sentences exceeded the aggravated range of the sentencing guidelines, the court abused its discretion and his sentence is excessive and in violation of Blakely v. Washington, 542 U.S. 296 (2004). I first note that it is well established that Blakely is not applicable in Pennsylvania because the Commonwealth utilizes an advisory, indeterminate, and guided sentencing scheme that does not violate the Sixth Amendment. Comm. v Yuhasz, 923 A.2d 1111 (Pa. 2007). It is irrelevant whether Bennett's sentences were outside of the guidelines as long as the sentences did not exceed the statutory maximums and the court recorded its proper reasoning for straying from the guidelines. Comm. v. Wagner, 702 A.2d 1085, 1085-86 (Pa. Super. 1997). Furthermore, the sentencing court may consider material not admitted in the defendant's plea. Yuhasz, 923 A.2d 1111.

Here, the maximum sentence for Third Degree Murder is 40 years while the maximum sentence for Rape, a felony of the first degree, is 20 years. 18 Pa. C.S.A. §§ 1102(d) & 1103(1). It is evident that Bennett's sentences do not exceed the statutory maximums.

Moreover, the sentencing judge explained in great detail the reasons why he deviated from the guidelines.  (N.T. 7/16/01, pp. 21-35).  The trial court, the PCRA court and the Superior Court during the PCRA appeal all found that Bennett's claim was meritless.  Trial Court Opinion, at 46-53; PCRA Opinion at 21-28; Comm. v. Bennett, No. 608 E.D.A. 2005, at 8 (Super. Ct. of Pa., April 18, 2006).   For the foregoing reasons, I find that the state courts' decisions were reasonable and not contrary to the law.

## I.   THE STATE COURTS PROPERLY DENIED BENNETT'S MOTION TO SEVER THE RAPE CHARGES FROM THE MURDER CHARGE.

Bennett claims that the trial court erred in denying his motion to sever the murder charge and the rape charges.  Bennett contends that he was prejudiced by having the offenses tried together because the murder and rapes were separate acts happening at different times in different parts of the apartment.  Pennsylvania Rule of Criminal Procedure 583 provides that a court may sever offenses if it appears that a party may be prejudiced by the offenses being tried together.  Whether to sever related charges is a matter within the trial court's discretion and may only be reversed upon a showing of manifest abuse or undue prejudice and clear injustice to the defendant.  Comm v. LaCava, 666 A.2d 221, 227 (Pa. 1995).  Pennsylvania Rule of Criminal Procedure 563 provides that offenses may be charged in the same information if: (1) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or (2) the offences are based on the same act or transaction.

The trial court and the Superior Court on direct appeal both concluded that the trial court did not abuse its discretion by denying Bennett's motion to sever.  Specifically, the trial court found that:  (1) the evidence of one offense would have been admissible in a trial for

the other offense because the evidence of each led to the natural development of the facts, the

offenses were "interwoven", and the evidence of both offenses completed the story of the crime

by providing immediate temporal and geographic context; (2) the jury was capable of separating

the evidence because the trial concerned distinct criminal offenses that were distinguishable in

time, space and the victims involved; and (3) Bennett was not prejudiced because the offenses

were interwoven yet distinct and the evidence was not used to show Bennett's propensity to

commit crimes or his bad character.  <u>Trial Court Opinion</u>, at 23-27.  The Superior Court agreed

and found no abuse of discretion.  <u>Appellate Opinion</u>, at 3-6.  I also agree.  The state courts'

conclusions were reasonable and not contrary to the law.  The trial court did not abuse its

discretion.

**J.     THE STATE COURTS' DETERMINATIONS REGARDING THE ADMISSIBILITY OF A PHOTOGRAPH OF R.L.'S BODY WERE PROPER.**

Bennett next argues that the trial court abused its discretion by admitting a

photograph of R.L.'s body, marked by the Commonwealth at trial as Exhibit C-23.  The decision

to admit photographs is a matter within the sound discretion of the trial court and will not be

overturned absent an abuse of discretion.  <u>Comm. v Carter</u>, 546 A.2d 1173, 1181 (Pa. Super.

1988).  Exhibit C-23 depicts the livingroom and kitchen of the apartment and features R.L.'s

corpse laying on the livingroom couch in the lower left-hand portion of the picture.  Bennett

contends that the photograph is inflammatory and prejudicial because it is a color photo which

depicts all of R.L.'s body.  This argument was properly rejected by the trial court and the

Superior Court on direct appeal.   As concluded by the trial court, the probative value of the

photo outweighed its prejudicial value and, thus, its admittance was proper.  <u>Trial Court Opinion</u>,

at 27; <u>see</u> Pa. R.E. 403.

There is no blood visible in the photo and it does not depict a close-up of the ligature mark around R.L.'s neck or any other wound.  As noted by the Superior Court, the picture is taken some distance away from the body and is not excessively gory, yet is close enough to the body so that it still has probative value.  <u>Appellate Opinion</u>, at 6-7.  The photo assisted the jury in understanding the medical examiner's description of the body and his medical conclusions.  The photo also showed the location of R.L.'s body, the towel with the lipstick mark and a partial layout of the apartment which helped the jury visualize what A.L. and the police saw.  The simple fact that the picture shows R.L.'s corpse does not mean that the picture is unfairly prejudicial to Bennett.  "All of the prosecution's evidence is intended to 'prejudice' the jury, and simply because it is damaging to the defense is no reason to exclude the evidence." <u>Comm. v. Rigler</u>, 412 A.2d 846, 852 (Pa. 1980).  The determinations by the state courts, including that the photo was not inflammatory and was admissible into evidence, are reasonable and not contrary to the law.  The trial court did not abuse its discretion.

## K.    THE STATE COURTS PROPERLY DETERMINED THAT DR. GO COULD OFFER EXPERT TESTIMONY.

Bennett asserts that Dr. Go, who testified for the Commonwealth as an expert in the filed of serology and the study and analysis of body fluids, was not properly qualified to do so.  Thus, Bennett contends that the trial court abused its discretion because Dr. Go.'s testimony was not reliable.  The qualification of an expert is a matter within the discretion of the trial court and will not be reversed absent an abuse of discretion.  <u>Comm. v. Puksar</u>, 740 A.2d 219, 226 (Pa. 1999).

The trial court and Superior Court on direct appeal properly rejected this argument as the record clearly demonstrates that Dr. Go exhibited the necessary knowledge and skill

needed to be declared an expert witness.  The trial court discussed the relevant testimony including Dr. Go's academic training in food science, his occupational training as a forensic scientist, and his extensive practical forensic science experience, and noted the fact that he had been qualified as an expert in other cases.  Trial Court Opinion, at 32-33; Appellate Opinion, at 8; see (N.T. 7/19/00, pp. 115-138).  The rather liberal Pennsylvania standard for qualifying an expert witness has been met in this case.  See Puksar, 740 A.2d at 226; Pa. R.E. 702.  I conclude that, as a result, it is clear that the state courts's conclusions were reasonable and not contrary to the law.  The trial court did not abuse its discretion in qualifying Dr. Go as an expert witness.

**L.    THE STATE COURTS' DETERMINATION THAT TRIAL COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO PRESENT THE TESTIMONY OF TWO WITNESSES WAS REASONABLE AND NOT CONTRARY TO ESTABLISHED LAW.**

In his final argument, Bennett contends that Galloway was ineffective for failing to present the testimony of Ernie Alexander (also discussed above in Section III. B.) and Ronald Chatary ("Chatary").  Bennett claims that there are two times critical to the prosecution in that they placed him at the crime scene:  (1) when A.L. testified that around 3 a.m., she heard R.L. and Bennett hollering and laughing in the apartment; and (2) when A.L. testified that Bennett first raped her around 6:30 a.m. and told her that he had killed her mother.  Bennett contends that these two witnesses would have helped establish that he was not at the apartment at these two times.

In addition to testifying about an alleged consensual sexual relationship between Bennett and A.L. (discussed above in Section III. B.), Bennett claims that Alexander would have also testified that he was with Bennett at Donna Jordan's apartment at 617 E. Baltimore Pike around 12 a.m., that Bennett then left and returned between 2 a.m. and 2:15 a.m., borrowed Alexander's bicycle and left again, and then returned at 5:30 a.m.  R.L.'s apartment, located at

517 E. Baltimore Pike, is approximately one block away from Donna Jordan's apartment. Bennett claims that Chatary would have testified that, while outside in the alley by R.L.'s apartment between 4:30 a.m. and 5 a.m., he heard R.L. talking to a man but could not recognize the man's voice. Bennett claims that Chatary knew him and would have recognized his voice. Since Chatary did not recognize the male's voice, Bennett alleges some other man killed R.L.

Even if Alexander had testified as to this time-line, it would not have helped exculpate Bennett. Given the short distance between the apartments, even with Alexander's testimony, Bennett could have easily been in R.L.'s apartment at 3 a.m. and 6:30 a.m. Moreover, as discussed more fully above in Section III. B., Alexander's testimony could have been exceedingly harmful given his knowledge of past violent encounters between Bennett and R.L. Also, this testimony would have placed Bennett near the crime scene around the times of the crimes. As discussed in Section III. B., I conclude that because Galloway's and Bennett's decision not to call Alexander was reasonable and not prejudicial, the state courts' conclusions to that effect were reasonable and not contrary to the law.

Chatary was not available to testify because he was in the hospital. Counsel attempted to stipulate to what Chatary would have said and the trial court offered to grant a continuance of the trial until he was available. Ultimately, however, Bennett decided not to enter into the stipulation or call Chatary at any time. (N.T. 7/20/00, pp. 39-42). Like Alexander, Chatary's testimony would not have been overly helpful to Bennett's case and could have been harmful. In his statement to the police, which was introduced into evidence as Exhibit D-2 by Bennett at the October 5, 2001 post-sentence hearing, Chatary stated that between 4:30 a.m. and 5 a.m., he heard R.L., who had a very distinctive raspy voice, talking to a man for about twenty minutes. Chatary indicated that the man was talking in a low voice and he was not sure who the

23

man was.  (10/5/01 Hearing Exh. D-2); (N.T. 10/05/01, pp. 25-26).  It is completely unfounded that Chatary would have testified that it was specifically not Bennett talking to R.L.  Moreover, as noted by the trial court, Chatary's testimony could have been harmful to Bennett's case because Chatary's statement also provided that he heard R.L. say "No! No! It hurts" and was moaning her daughter's name.  Trial Court Opinion, at 38-39; (10/5/01 Hearing Exh. D-2); (N.T. 10/05/01, p. 77) .  Galloway also thought it was inadvisable to call Chatary as a witness because Chatary had stated that A.L. approached him and indicated that Bennett had killed her mother and raped her.  (N.T. 10/05/01, pp. 27, 77-78).  Galloway's and Bennett's decision not to call Chatary as a witness was completely reasonable.  The state courts' conclusion that, as a result, Galloway had not provided ineffective assistance, was likewise reasonable and not contrary to the law.

## IV.    CONCLUSION

After close and objective review of the arguments and evidence, I find that Bennett's petition for writ of habeas corpus is meritless.  There exists detailed incontroverted testimony from A.L. regarding the two rapes by Bennett and various admissions by Bennett that he killed A.L.'s mother.  Many key points of forensic evidence support A.L.'s testimony and the conclusion that Bennett was guilty of the crimes charged.  The efforts by Bennett to raise significant flaws in his conviction are illogical or have no relevance to his burdens under the law. In all instances raised by Bennett, the state courts' conclusions were reasonable and not contrary to the law and counsels' actions were reasonable and not so prejudicial that different actions would have altered the outcome of the trial.  As a result, Bennett's petition will be dismissed.

Similarly, because Bennett's claims are both legally and factually meritless, there

is no need to conduct an evidentiary hearing nor is there a need to appoint counsel, as neither device would have changed the outcome of this case.  See Campbell v. Vaughn, 209 F.3d 280, 287 (3d Cir. 2000); Reese v. Fulcomer, 946 F.2d 247, 263-64 (3d Cir.1991) *superseded on other grounds by statute*, 28 U.S.C. § 2254(d).

An appropriate order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GERALD BENNETT            :      CIVIL ACTION
                                      :
        v.                          :      NO.  07-3935
                                        :
LOUIS S. FOLINO, et al.         :

### ORDER

AND NOW, this 7th day of April, 2008, upon consideration of the Petition for

Writ of Habeas Corpus and the response thereto (Doc. Nos. 1 & 13), it is hereby **ORDERED** that

for the reasons set forth above, the Petition is **DISMISSED with prejudice and without a**

**hearing**.

**IT IS FURTHER ORDERED** that no certificate of appealability will be issued

pursuant to 28 U.S.C. §2253 because petitioner has failed to make a substantial showing of denial

of a constitutional right.

The Clerk of Court is hereby directed to mark this case closed.

_____
LOWELL A. REED, JR., Sr. J.